STATE NAT. BANK OF SHAWNEE v. McMAHAN *et al.*

No. 2965.  Opinion Filed January 9, 1915.

Rehearing Denied February 9, 1915.

(146 Pac. 1.)

1.  PLEADINGS—Relation—Existence—Advances on Cotton. Where a cotton buyer and a bank arrange that such buyer will buy cotton and draw upon the bank with bills of lading attached to draft; the bank is to pay the draft and hold bill of lading as

security for the money so advanced, and upon cashing said draft with bills of lading attached the bank charges the amount of the draft to the account of the buyer—the relation of pledgee and pledgor thereby exists.

2. LARCENY—Property Subject—Bill of Lading—"Personal Property." A bill of lading is "personal property," under section 2660, Rev. Laws 1910, in the sense that the same may be the subject of larceny.

3. LARCENY—What Constitutes—Theft of Pledge. Where a pledgor by fraud or stealth obtains the possession of a pledge from the pledgee with the felonious intent to deprive the pledgee of his lien, and to appropriate the pledge to the use and benefit of such pledgor, such acts amount to larceny.

4. PLEADINGS—Actions—Direction of Verdict. Where there is evidence reasonably tending to show that a pledgor obtained possession of property pledged by larceny from his pledgee; in a replevin action by such pledgee against an innocent purchaser for value, it is error to direct a verdict against such pledgee; such evidence presents an issue of fact which should be submitted to the jury under proper instructions.

(Syllabus by the Court.)

*Error from Superior Court, Pottawatomie County;*

*George C. Abernathy, Judge.*

Replevin by the State National Bank of Shawnee, a corporation, against D. V. Liddell and John C. Liddell, Jr., doing business as D. V. Liddell & Co., and others, wherein B. W. McMahan and others, doing business as B. W. McMahan & Co., intervened. Judgment for interveners on directed verdict, and plaintiff brings error. Reversed and remanded for new trial.

*Stanard, Wahl & Ennis* and *Ames, Chambers, Lowe & Richardson* and *Carr & Field* and *Samuel W. Hayes,* for plaintiff in error.

*P. K. Morrill* and *Shartel, Keaton & Wells* and *Cottingham & Bledsoe* and *Edw. Howell* and *C. O. Blake* and *R. J. Roberts* and *J. H. Woods* and *Cruce & Cruce,* for defendants in error.

LOOFBOURROW, J.   The facts are substantially as follows:

In September, 1910, D. V. Liddell & Co., cotton buyers, went to the State National Bank of Shawnee and made arrangements whereby said bank was to carry their cotton account; that is, Liddell & Co. were to buy cotton the market at Shawnee and Pauls Valley and tributary territory and draw upon the State National Bank for the purchase price, attaching to the drafts bills of lading for the cotton, and the bank was to hold the bills of lading as security for the money by them advanced, and, if at any time it felt itself unsafe or insecure, it was agreed that they could sell any cotton for which they held bills of lading. On October 10, 1910, Liddell & Co. bought 106 bales of cotton from F. M. Redding, giving Redding a draft, drawn by J. C. Washington, agent of Liddell & Co., on Liddell & Co., care of State National Bank, the plaintiff bank, attaching to the draft bills of lading for the cotton, the cotton to be shipped to the compress at Shawnee. In the bills of lading Redding was named as consignor and consignee, and the bills of lading were never indorsed by Redding. The bank honored the draft and charged the same to the account of D. V. Liddell & Co. and retained the bills of lading. On October 8th and 9th one Simpson agreed to buy from Liddell & Co. about 450 bales of cotton; and on October 15th one Allen, the broker of the intervener McMahan & Co., agreed to buy of Simpson 400 bales of cotton, and on that night it was agreed between Liddell & Co., Allen and Simpson, that Liddell & Co. should make the delivery direct to Allen of the cotton which he had agreed to deliver to Simpson, and on Monday, the 17th of October, Liddell & Co. delivered 106 bales, the cotton in controversy, to Allen, for McMahan & Co. On the same day the cotton was classed, the average price determined, the weight secured from the compress, the expense bills were produced and the draft of McMahan & Co. drawn upon the Altus State Bank in favor of D. V. Liddell for $8,019.73, delivered in

payment of the cotton. Allen placed the mark of McMahan & Co. on each bale, "V. A. L." After Liddell & Co. had delivered the cotton to Allen for McMahan & Co., John C. Liddell went to the plaintiff bank and told one Barnett, the assistant cashier, that the cotton was in, and requested that plaintiff let him have the bills of lading and he and D. V. Liddell would go to the railway company's office and exchange the bills of lading for the compress tickets and bring the tickets back to the bank. To this agreement Barnett assented, taking a written receipt from Liddell for the bills of lading as follows:

"Received of C. M. Cade, cashier, the following bills of lading to get tickets and return the same."

The Liddells exchanged the bills of lading for the compress tickets, which were in the following form:

### Weights.

On 28 bales of cotton for account of F. M. Redding from Asher Station C. R. I. & R. R. Car 23082 B/L 56 W/B 1012. Marks ———— number of B/C signed for on B/L 32; S/OB/L 56.

| Press | Tag No. | Shipper's Tag No. | Weight | Class |
|-------|---------|-------------------|--------|-------|
| 1     | 9487    | 29104             | 500    |       |

Not responsible for loss by damage, fire or acts of Providence. Not negotiable.

Date and hour unloaded 10/11/10 5 p. m.

Philip Watson, Supt.

Weighed by J. H. Lyle.

Press at Shawnee, Okla.

Thereupon Liddell attached the compress tickets to the draft given them by Allen. Liddell took the train to Ada, Okla., and deposited the draft in the Merchants' & Planters' State Bank of Ada, and the draft, as introduced in evidence, bears the indorsement: "Pd. 10/20/10, Altus State Bank, W. C. Baker, Cash."

On November 3, 1910, plaintiff commenced this suit in replevin. The testimony further shows that neither McMahan & Co. nor the agent, Allen, had any knowledge of the existence of any lien or claim against the cotton by the plaintiff bank. On December 29, 1910, B. W. McMahan & Co. filed their petition of intervention. On the trial of the case the only issues litigated were those between the plaintiff and intervener.

At the close of the plaintiff's evidence, the intervener demurred, and, pending the consideration of the demurrer, the plaintiff asked leave and was granted permission to amend its petition and affidavit in replevin to conform to the facts proven, and thereupon filed the following amended petition:

"Comes now the plaintiff above named and, leave of court being first granted, files this its amendment to the petition heretofore filed in said cause, and as such amendment alleges and says:

"That the interest of the plaintiff in and to the property sought to be replevined herein is based upon a contract entered into between the said plaintiff and J. C. Liddell and D. V. Liddell on or about the 21st day of September, 1910, wherein the said J. C. Liddell and D. V. Liddell, acting as partners doing business under the firm name of D. V. Liddell & Co., requested the said plaintiff herein as such banking institution to furnish D. V. Liddell & Co., certain moneys for the purchase of cotton in and near the county of Pottawatomie, Okla. The said D. V. Liddell & Co., and their agents to purchase the said cotton and have the same shipped to the Interstate Compress Company at Shawnee, Okla., and to a certain compress company at Pauls Valley, Okla., and that the shipments should be made and bills of lading procured from the railway companies for such shipments and should be sent to the plaintiff herein with draft attached for the amount of the purchase price of the cotton so purchased which was represented by said bills of lading. That the said plaintiff should also furnish to D. V. Liddell & Co., sufficient money to pay all freight bills for the shipping of said cotton and other necessary expenses; and that, under and by virtue of the terms of said agreement, the said plaintiff herein was to hold said bills of lading

as security for the repayment to plaintiff of the moneys advanced by plaintiff upon such drafts, and the D. V. Liddell & Co., were to have the right, upon the payment of the amounts advanced by the said bank for the purchase price of said cotton as shown by said bills of lading and expenses of freight and other necessary expenses to said bank, to have the said bills of lading turned over to them. It was further agreed that upon the failure of the said D. V. Liddell & Co. to pay said amounts within a reasonable time, or upon the bank feeling itself insecure in holding the said bills of lading and the property presented thereby, the said bank would have the right at such time to sell said cotton represented by the said bills of lading and reimburse itself for the purchase price so advanced by it and for all other necessary expenses attendant upon the carrying out of the terms of said agreement. That under and by virtue of said contract and agreement, the said D. V. Liddell & Co. purchased the cotton sought to be replevined in this action, and sent to the plaintiff herein the bills of lading with draft attached, and the said plaintiff herein paid said drafts and the necessary expenses toward the shipment of said cotton to the Interstate Compress Company of Shawnee, Okla. That said cotton was so shipped to the Interstate Compress Company of Shawnee, Okla., and was in their possession at the time of the institution of this replevin action. That afterwards and, to wit, on the 17th day of October, 1910, J. C. Liddell, Jr., presented himself to the bank of this plaintiff and stated to the said plaintiff, who then held the bills of lading to the cotton in controversy in this action, that the Interstate Compress Company tickets were in the hands of the railway company, and falsely and fraudulently, and with the felonious intent to deprive the plaintiff of the possession of said bills of lading, represented to the said plaintiff that if it would give to him the bills of lading he would present the same to the railway company, secure the compress tickets, which were the receipts of the Interstate Compress Company for the cotton which they then held, and that he would immediately return the compress tickets so received by him from the railway company to the said bank. That the said bank, relying upon the statements and representations of the said J. C. Liddell, Jr., and believing the same to be true, delivered to him the said bills of lading for the purpose of procuring said compress tickets and returning the same to said bank. That the said J. C. Liddell, Jr., presented said bills

of lading to the railway company, received the compress tickets therefor, and fraudulently, unlawfully, and feloniously converted the same to his own use. That the said plaintiff herein is the owner of said property as above stated and is entitled to the immediate possession of the same. That it has never been reimbursed for the purchase price so paid or expenses incurred.

"Wherefore he prays that the possession of said property be delivered to him or its value."

The interveners thereupon filed amendment to their petition of intervention, in which they denied the existence of the *lien* claimed by the plaintiff; alleged that any lien which the plaintiff may have had was dependent upon possession being retained by it; and that the plaintiff voluntarily restored and delivered possession of the cotton and bills of lading to Liddell & Co., the owners thereof, and clothed them with the apparent, free, and unincumbered title thereto, thereby releasing any lien which they may have had, and that the interveners purchased said cotton, without any knowledge of the lien claimed by the plaintiff, from the parties in possession thereof for a valuable consideration. To the interveners' petition the plaintiff filed a general denial. The court directed a verdict in favor of the interveners; the verdict being returned, a judgment was rendered thereof. From which judgment plaintiff appeals.

It is clear from the foregoing statement and pleadings that when Liddell & Co. purchased the cotton from Redding the purchaser thereby became the owner of the cotton. It is also certain that, as between the plaintiff bank and Liddell & Co., it was not the intention that the bank should become the owner of the cotton, but that Liddell & Co. should be the owner, and that it was the intention of the parties that the bank should advance the money with which Liddell & Co. should purchase cotton, and that the bank, as security for the money advanced, should hold the bill of lading or compress tickets as security; the relation existing between the plaintiff bank and Liddell & Co. was that of pledgee

and pledgor. The absolute title to the cotton could not vest in the bank except by a foreclosure of the right of redemption, by a judicial sale under the directions of a competent court, or the pledgee bank might have purchased the property pledged by direct dealing with the pledgor, in good faith. See section 4523-4 Rev. Laws 1910. The bank paid Liddell & Co.'s draft, and, as long as it retained possession of the bill of lading, although it was not indorsed by Redding, the validity of the pledge could not be questioned.

Bills of lading are symbols of property and are regarded as so much cotton, grain, or other articles of merchandise, and the transfer of the bill of lading is the symbolic delivery of the property itself. Section 4500, Rev. Laws 1910, provides:

"A pledge is a deposit of personal property by way of security for the performance of another act."

Sec. 4502. "The lien of a pledgee is dependent on possession, and no pledge is valid until the property pledged is delivered to the pledgee. * * *"

It is elementary that one who purchases stolen property, however innocent he may be, takes no better title than his vendor, and the owner may recover it whenever found, unless he has so acted as to estop himself.

That a pledgor may be guilty of the larceny of his own goods from his pledgee is a proposition so well settled as to require no citation of authorities.

Allen, the broker of McMahan & Co., testified that on Sunday, October 16th, McMahan was in Shawnee and give him draft book with which to buy the cotton, and also as follows:

"Q. Now on Sunday you say that Liddell delivered 106 bales to you? A. Yes, sir. Q. Where at? A. At the compress in Shawnee. Q. Just state what was done with reference to that.

A. I went down and classed out the cotton. Q. Who was there? A. D. V. Liddell and John C. Liddell. Q. How did you find the cotton. A. They had the number of it. Q. Do you know about what time you started to class it? A. I could not remember just what time, but I suppose it was something like 10 o'clock. Q. Did you take samples of each bale? A. Yes, sir. Q. And you would sample it and say what you thought about it? A. Yes, sir. Q. And give the class of that bale of cotton? A. Yes, sir. Q. And put it down? A. Yes, sir. Q. After you got through classing it, what would you do then? A. Figure up and average the prices. Q. Did you find out what the cotton weighed? A. Yes, sir. Q. Where did you find that? A. From the compress weight sheets. Q. After you got the weight and class of the cotton, where did you go, if anywhere? A. We got the expense bills, and I give him a draft for the amount of the cotton and the expense bills with the tickets attached. Q. Where did you make the draft? A. In my office. * * * Q. When you got through figuring up the weight and class and the amount of the cotton, were there any compress tickets or anything of the kind produced? A. I made out the draft with the compress tickets and the expense bills attached. Q. Who produced them? A. I guess he did. Q. Who give you the compress tickets. A. I could not tell that. I give him the draft. Q. You saw the compress tickets? A. I do not remember whether I saw them or not. Q. Did you see the expense bills? A. Yes, sir. Q. Were the expense bills figured on the price of the cotton? A. Yes, sir; that amount was added to it. Q. And then were the drafts attached to anything? A. The expense bills and tickets were to be attached on with the draft. Or the draft would be no good. Q. After you wrote up the draft, what did you do with it? A. I gave it to him. Q. I hand you Exhibit N and ask you to examine that and state if you ever saw it before? A. Yes, sir. Q. What is it? A. That is a draft for 106 bales of cotton. Q. Is that the draft you delivered to Liddell on the 17th day of October? A. Yes, sir. Q. Which one of the Liddells did you deliver it to? A. D. V. Liddell. Q. What was it delivered to him for? A. 106 bales of cotton. Q. Were any marks or tags placed on the cotton at the compress? A. It was marked 'V. A. L.' Q. Who marked it that way? A. McMahan marked it just to identify the cotton. Q. Had you been directed by him to put that mark there. A. No, sir; but whenever I received any cotton I always put a mark

on it. Q. That was McMahan & Co.'s mark for that cotton. A. Yes, sir. Q. What kind of letters were they. A. I had the compress to mark it for me. Q. What kind of letters was it in? A. I suppose it was put on with what we call the thumb brush, just the cotton marking brush. Q. At the time you purchased this cotton in October, the 17th, and had McMahan's mark put on it and delivered this draft to Liddell in payment of the cotton, did you have any qnowledge or notice whatever of any one else having any claim on the cotton? Did you know what banking arrangements, if any, Liddell had? A. No, sir. Q. Did you know what place, if any, Liddell & Co. or D. V. Liddell and John C. Liddell were carrying their account here?. A. No, sir."

Barnett, assistant cashier of the plaintiff bank, testified that Liddell came for the bills of lading at the noon hour. All this testimony is uncontroverted. This testimony shows the delivery of the cotton to Allen to have been completed before the plaintiff bank had given the bills of lading to Liddell, without the knowledge or consent of the plaintiff.

"Larceny" is defined by our statutes as "the taking of personal property, accomplished by fraud or stealth, with the intent to deprive the owner thereof."

Lanceny at common law, as defined by Cooley's Blackstone (4th Ed.) p. 1388, is "the felonious taking and carrying away of the personal goods of another."

First, there must be a taking; this implies the consent of the owner to be wanting. The evidence conclusively shows that the delivery of the possession of the cotton to Allen by Liddell was without the knowledge or consent of the plaintiff bank.

Second, there must be a carrying away or asportation. The 106 bales were segregated, classified, and marked "V A L" to identify them as the property of McMahan & Co. In Cooley's Blackstone, supra, p. 1393, the author says:

"A bare removal from the place in which he found the goods,

though the thief does not quite make off with them, is a sufficient asportation, or carrying away. As, if a man be leading another's horse out of a close, and be apprehended in the act; or if a guest, stealing goods out of an inn, has removed them from his chamber downstairs; these have been adjudged sufficient carrying away to constitute larceny. Or, if a thief, intending to steal a plate, takes it out of a chest in which it was, and lays it down on the floor, but is surprised before he can make his escape with it; this is larceny."

And in the notes it is said:

"A very slight removal of an article from its place has been held to constitute carrying away. A parcel lying in a wagon was carried from one end of the wagon to the other, but was not taken from it; held a sufficient carrying away. *R. V. Cozlett,* 2 East, P. C. 556.

"A thief snatching an earing from a lady's ear, but it fell in her hair. As it was for an instant in his possession, held a sufficient carrying away. *R. V. Lapier,* 2 East., P. C. 557.

"A person called on defendant to pay a note; the latter asked to see it; in its being handed him, he concealed or destroyed it. Held sufficient. *State v. Fenn,* 41 Conn. 590; *People v. Call,* 1 Denio (N. Y.) 120, 43 Am. Dec. 655

"A person stole keys from another's pocket, opened a safe, took money from drawer completely out, and was handling the money when caught; held sufficient carrying away of the money *State v. Green,* 81 N. C. 560."

Third, the intent, the taking and carrying away, or asportation, must have been felonious. The clandestine taking usually affords sufficient evidence of the felonious intent; the clandestine delivery of the cotton, together with the subsequent acts of the Liddells, established the intent most conclusively.

Fourth, the intent to deprive the owner or pledgee of his property, and to appropriate the same to the use and benefit of the pledgor. The bills of lading were obtained by larceny.

Section 2660, Rev. Laws 1910, provides:

"If the thing stolen consists of any evidence of debt or other written instrument, the amount of money due thereon or secured to be paid thereby, and remaining unsatisfied, or which in any contingency might be collected thereon, or the value of the property the title to which is shown thereby, or the sum which might be recovered in the absence thereof, as the case may be, shall be deemed the value of the thing stolen."

Under the statute, a bill of lading or compress ticket in pledge is property in the sense that it is the subject of larceny.

When Liddell secured the possession of the bill of lading, he concealed from his pledgee the fact that he had sold the cotton. He was permitted to take the bill of lading for the express purpose of exchanging the same for compress tickets, which he promised and agreed to return to the bank. There was no intention on the part of the bank to part with its property, but Liddell then intended to convert the property to his own use and to deprive the bank of its security; this was in furtherance of his preconceived intent to deprive plaintiff of its pledge. The felonious taking of the bill of lading—personal property—accomplished by fraud, with intent to deprive the pledgee thereof and appropriate the same to his own use, constitutes all the elements of the crime of larceny.

This is a suit in replevin, and whether or not the acts of the Liddells in securing the cotton and bill of lading, etc., amounted to larceny, was a question of fact which plaintiff had a right to have submitted to a jury.

We are of the opinion that the trial court erred in directing a verdict for the interveners. The plaintiffs should be protected to the extent of any amount due and unpaid upon the pledge, if they were deprived of their pledge by larceny.

The judgment is therefore reversed and remanded for a new trial.

All the Justices concur.